**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| Anonymous<br><br>      Plaintiff,<br><br>vs.<br><br>IntraFi LLC;<br><br>Nexus Buyer LLC;<br><br>Mark Jacobsen; and<br><br>Susan Gayle<br><br>Defendants. | Civil Action No.: _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ("Plaintiff"), by her attorneys, respectfully alleges claims for whistleblower retaliation, wrongful termination, breach of contract, negligent and intentional misrepresentation, and fraudulent inducement against Defendants IntraFi LLC ("IntraFi") and Nexus Buyer LLC ("Nexus") (also collectively referred herein as "Defendants"), and individually against Mark Jacobsen and Susan Gayle (also collectively referred herein as "Defendants"), as follows:

**NATURE OF THE ACTION**

1.      Plaintiff is a former Chief Risk Officer ("CRO") at Defendants IntraFi and Nexus. As set forth below, Plaintiff submits this Complaint because Defendants unlawfully retaliated against her for exercising her rights to inform her supervisors about, and refused to participate in, conduct that she reasonably believed violated (a) laws and rules designed to protect consumers from fraudulent practices in connection with the sale of securities, and (b) laws, rules, orders,

1

standards, or prohibitions subject to the jurisdiction of, or enforceable by the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Comptroller of the Currency.

2.     Prior to hiring Plaintiff, Defendants vetted her for over six months and asked her to participate in a competitive interview process. Early communications between Plaintiff and Defendants demonstrate that Plaintiff was more than qualified to fill the role of CRO. In fact, Chief Executive Officer (CEO) Marc Jacobsen and Chief Administrative Officer (CAO) Susan Gayle repeatedly told Plaintiff that her breadth of knowledge and experience in this field, especially her Technology and Cyber Security risk management experience, made her a perfect fit for the company.

3.     However, once Plaintiff started to raise concerns about a data breach discovered right after she joined the company, Defendants became visibly alarmed and disturbed that someone who came to do the right thing in risk management would rock the boat and sought to oust her immediately.

4.     Within just a few days of asking questions and offering a plan to rectify the aftermath of the data breach and within 2 days of meeting with the FRB regulators to speak of her concerns, Defendants terminated Plaintiff from her CRO position on March 31, 2026.

5.     But for Plaintiff's protected activity in vocalizing concerns about the company's failure to properly address a company data breach and the company's lack of risk management functions, Defendants would not have retaliated against and ultimately terminated Plaintiff.

6.     Plaintiff acted righteously because she did not want to be held liable for concealing the details of a company's data breach from regulators, publicly traded clients and consumers, nor did she want to let the company operate with known material compliance failures and risk management deficiencies.

7.      As detailed below, Defendants subjected Plaintiff to retaliation, including wrongful termination. Defendants' retaliatory conduct against Plaintiff violates Sarbanes Oxley Act, SOX, 18 U.S.C. §1514A, and the Virginia Whistleblower Protection Act, Va. Code § 40.1-27.3. Additionally, Defendants are also in violation of common law charges related to Plaintiff's employment agreement, including breach of contract, negligent and intentional misrepresentation, and fraudulent inducement.

8.      In all, IntraFi and its CEO Jacobsen and CAO Gayle face substantial exposure for its breach of employment agreement with Plaintiff and retaliatory conduct against her.

9.      Plaintiff now seeks all appropriate relief stemming from Defendants' retaliatory termination of her employment.

## JURISDICTION AND VENUE

10.     Jurisdiction of this Court over Plaintiff's claims is invoked pursuant to 18 U.S.C. Section 1514A(b)(1)(B) and 28 U.S.C. Section 1331.

11.     Venue is proper within this district, pursuant to 28 U.S.C. Section 1391(b)(2), in that "a substantial part of the events or omissions giving rise to the claim occurred" in Arlington, Virginia.

## PARTIES

12.     Plaintiff is a citizen of the United States of America and a resident of McLean, Virginia. From March 1, 2025 to March 31, 2025, Plaintiff was employed by Defendants IntraFi and Nexus as the CRO.

13.     Defendant IntraFi is a financial services company headquartered in Arlington, Virginia, with its parent company Nexus Buyer LLC. IntraFi manages and places over $740 billion in deposits across more than 3,000 U.S. banks and broker-dealers. At all times relevant to this

3

action, IntraFi employed Plaintiff as its CRO. At all times relevant to this action, IntraFi retaliated against Plaintiff in the manner described in this Complaint at the Arlington, Virginia location.

14. Defendant Nexus Buyer LLC is a Washington, D.C. metropolitan area–based provider of deposit allocation technology and services to banks in the United States and the owner and operator of IntraFi. Its principal services include the Certificate of Deposit Account Registry Service, IntraFi Cash Service, and IntraFi Sweep. Nexus Buyer LLC is a wholly owned subsidiary of Nexus Intermediate Parent LLC, which in turn is a wholly owned subsidiary of Nexus Parent LLC.

15. Defendant Mark Jacobsen is the Chief Executive Officer of IntraFi. At all times relevant to this action, IntraFi retaliated against Plaintiff in the manner described in this Complaint at the Arlington, Virginia location.

16. Defendant Susan Gayle is the Chief Administrative Officer of IntraFi. At all times relevant to this action, IntraFi retaliated against Plaintiff in the manner described in this Complaint at the Arlington, Virginia location.

**FACTS COMMON TO ALL COUNTS**

**I.      Defendants Aggressively Pursued Plaintiff for the Chief Risk Officer Position**

17. On March 1, 2025, Plaintiff officially started as the CRO of IntraFi.

18. Plaintiff came to IntraFi with an impressive background. Prior to her role at IntraFi, Plaintiff worked for a ~$200 billion financial institution for over seven years. Plaintiff was Head of Real Estate Lending Risk Management & Training from 2018 to 2021 and then the Head of Security Governance, Risk and Compliance from 2021 to March 2025, managing hundreds of seasoned professionals, including other executives and officers.

19.    In Plaintiff's risk management and compliance roles at prior major financial institutions, she was responsible for establishing, implementing, and scaling dozens of enterprise-wide risk management and compliance programs and capabilities – several of which were specific to Technology and Information Security.

20.    Moreover, Plaintiff was the lead executive responsible for remediating several high-risk regulatory findings throughout her career, which she did successfully. She was also responsible for helping one of the largest U.S. financial institutions become Sarbanes-Oxley compliant after the passage of the SOX. Through her position, she maintained a strong reputation with regulators.

21.    Additionally, Plaintiff has had extensive management experience and has held various substantial risk management and compliance roles throughout her 20-year career, including at the Federal Deposit Insurance Corporation (FDIC) and major financial institutions.

22.    In May 2024, a former colleague who had worked with Plaintiff at her prior employer for several years, and current Chief Information Officer (CIO) of IntraFi, Randy Hopper, informed Plaintiff of an upcoming CRO role at IntraFi and recommended her for the position.

23.    Mr. Hopper reached out to Plaintiff after speaking with CEO Jacobsen and CAO Gayle. Mr. Hopper shared with Plaintiff that IntraFi leadership was in need of a CRO with extensive risk management experience, given the current lack of such experience at IntraFi and the growing FFIEC regulatory oversight and risk management expectations conveyed to the Company. Mr. Hopper conveyed both verbally and in written communication that Plaintiff was a great fit for IntraFi and the role.

24.    Plaintiff had not been looking externally for a job. She liked her current position, and she was hoping to stay with the company that she was at for the long-term.

25.    IntraFi urged to meet with Plaintiff as soon as possible.

26.    Prior to the interview process, Plaintiff met with Ms. Gayle on several occasions, at least six hours of meetings. She also spoke with the CIO on several occasions as well.

27.    Shortly thereafter, Plaintiff engaged in a competitive interview process with over a dozen interviewers and extensive leadership assessments, managed by a well-known executive search firm, which involved 25 other qualified candidates. She also interacted with additional employees prior to starting in her role.

28.    Plaintiff was informed twice by IntraFi that she was the top candidate in the competitive interview pool. She was told repeatedly she was a great fit for the role.

29.    Commensurate with Plaintiff's experience and excellent background, IntraFi offered Plaintiff an attractive compensation package. This signed offer included a $400,000 base salary plus a $450,000 annual bonus and a retention buy-out bonus (up to $300,000).

30.    Around the time of Plaintiff's hire, IntraFi shared with Plaintiff that the company was in the midst of a due diligence process for acquisition by several firms, which included at least one publicly traded firm that would result in a $12-$15 billion deal. This information was provided to Plaintiff during her interview with the CEO in December 2024.

31.    IntraFi executives, including Ms. Gayle, shared intel about the upcoming sale, including valuations. Accordingly, IntraFi offered eligibility to the Management Incentive Plan (MIP), in which Plaintiff would be awarded 271,090,317 units of the Class B pool. Plaintiff turned down the initial offer conveyed by the executive search firm shortly after her interviews. After being presented with a higher offer and prior to being informed and assured of the MIP component of the package, Plaintiff made it clear she remained hesitant about accepting the offer under the terms and given the chance of a sale.

32. To ensure that she was making the right decision, before executing the final employment agreement, Plaintiff asked Ms. Gayle in a December 19, 2024 email, "First, when would the Board approval of the MIP award occur—and is there a chance they may not approve it?"

33. Ms. Gayle responded, "Board will rubber stamp. Just a formality. Board set aside for future c level hires," reassuring Plaintiff that she would receive the Class B pool shares and they would fully vest and be distributed in the event of a sale. Ms. Gayle's confirmation and the shares portion of the offer cemented Plaintiff's decision to leave her current employer and accept IntraFi's offer. The December 19, 2024 email is attached as **Exhibit 1**.

34. With Ms. Gayle's reassurance, Plaintiff accepted the CRO position at IntraFi.

**II.    Defendants Breached its Employment Agreement with Plaintiff**

35. Despite Ms. Gayle's representations about Plaintiff's compensation package prior to the execution of the employment agreement, which Plaintiff heavily relied on to make her final decision to make the career move, IntraFi immediately retracted Plaintiff's compensation package once Plaintiff started with the Company.

36. About two weeks after the start date, on March 20, 2025, at approximately 2:00 p.m. ET, Plaintiff met with Ms. Gayle.

37. During this in-person meeting, Ms. Gayle informed Plaintiff that there was a problem related to Plaintiff's compensation package.

38. Specifically, Ms. Gayle shared that IntraFi would not be honoring the approved Class B Shares promised to Plaintiff prior to and at the point of hire. Ms. Gayle claimed that the company's multi-billion acquisition was just a few weeks away and that the Private Equity (PE) firms were not happy about the lucrative offer to certain new hires, including Plaintiff.

7

39.    Plaintiff was deeply disappointed and surprised with the proposed modifications to her compensation package.

40.    In response, Plaintiff raised that Ms. Gayle had told her before she was hired that Ms. Gayle had already received Board approval for her compensation. Ms. Gayle affirmed, "Yes, I received approval from those on the Board I was told to run the offer by." However, Ms. Gayle simply reiterated that the PEs were opposed to the Class B share awards to Plaintiff.

41.    Plaintiff was stunned by the news and tried to negotiate with Ms. Gayle. Plaintiff had made a difficult decision to make the career move from where she had been for over 7 years in a role she enjoyed with a team she built over the years. In response, Ms. Gayle disparaged Plaintiff's prior employer and continued to convince Plaintiff she made the right decision to join IntraFi and that she had a bright future ahead of her with them.

42.    Ms. Gayle refused. Instead, she offered a $450,000 retention agreement over the course of three years. She also made an obscure proposal indicating that Plaintiff would be eligible for the acquiring Company's MIP. When Plaintiff asked Ms. Gayle to explain the valuation of the new MIP, Ms. Gayle vaguely answered that she did not know because the Company's acquisition had not occurred yet.

43.    Ms. Gayle dodged Plaintiff's questions by explaining that she had personally listed Plaintiff on a so-called "Key Person Employee List." Ms. Gayle reiterated that she and the company viewed her as the key to the success of the company and especially in the case of a sale. Plaintiff conveyed concerns about the perceived bait and switch with her compensation, especially in the midst of a sale.

44.    Plaintiff left the meeting with Ms. Gayle feeling frustrated. Ms. Gayle and IntraFi had made misrepresentations about the compensation package offered to Plaintiff at the point of

8

hire. Further, Ms. Gayle and IntraFi had fraudulently induced Plaintiff to take the CRO position under false pretenses by offering a compensation package that was completely different from what had been assured to Plaintiff at the point of hire. Plaintiff requested that the changes being presented to her be provided in writing for her review.

45.     During a follow-up call, later that day, Ms. Gayle informed Plaintiff that IntraFi would only be willing to offer a $600,000 retention agreement over three years and extend her severance to 8 months based only on base pay not including bonus. There would be no Class B shares.

46.     Ms. Gayle intimidated Plaintiff by sharing that CEO Jacobsen was upset over this renegotiation process. Ms. Gayle also commented that other incoming executives who were impacted had not made a big deal over the misrepresentation and changes made to their compensation offers and related shares.

47.     At the end of the call, Ms. Gayle told Plaintiff, "If you are upset with us and do not trust us, we can discuss a buy-out agreement."

48.     Plaintiff politely declined for fear of retaliation and losing the new position with IntraFi. However, Plaintiff was intimidated by Ms. Gayle's comments regarding the CEO's reactions to the circumstances that had spiraled out of her control.

49.     Plaintiff was utterly shocked and perplexed. As Plaintiff had shared with Ms. Gayle, she had not intended to leave her prior employer. She had not been seeking a new job. She had heavily weighed the factors and opportunities provided to her by IntraFi, relying on IntraFi's express representations that led her to accept the job offer. The Class B Shares were a key component to IntraFi's compensation package, which the Company used to incentivize Plaintiff.

50.     In her December 19, 2024 email response to Plaintiff's question about the Board's approval, Ms. Gayle made misrepresentations to entice Plaintiff to accept the CRO position.

51.     As a result, Plaintiff has suffered a financial, opportunity, and reputational loss for relying on those misrepresentations.

52.     Thus, Defendants IntraFi and Nexus are in breach of the employment agreement executed on December 19, 2024, and Defendants Jacobsen and Gayle should also be held liable for negligent and intentional misrepresentation, and false inducement.

III.     **Plaintiff Engaged in Protected Activity by Raising Concerns about a Data Breach and Other Compliance Issues**

A.     **Plaintiff Highlighted the Need for IntraFi to Strengthen Risk Management, Regulatory Compliance, Internal Audit, Reporting and Control Measures**

53.     Prior to IntraFi retracting Plaintiff's compensation package, and just ten days after her start date, she had a meeting with PricewaterhouseCoopers ("PwC"), which serves as the outsourced Internal Audit function under the CRO role at IntraFi.

54.     During the meeting, Plaintiff learned that IntraFi had been purposefully limiting PwC's access to select functions for internal audit. She also learned that certain executives ignored and/or pushed back on PwC's audit concerns.

55.     During the meeting, PwC also shared with Plaintiff that they were surprised to discover that there was little-to-no enterprise risk management at IntraFi, even though IntraFi managed and placed $740+ billion in funds as an organization.

56.     Plaintiff assured PwC that she would support and advocate for broader audits moving forward and discussed best practices related to Enterprise Risk Management and Internal Audit functions. PwC expressed relief with Plaintiff's onboarding as the new CRO. Additionally,

10

Plaintiff asked PwC to share Enterprise Risk Management materials with her and promised to further discuss with IntraFi and educate executives.

57.     Plaintiff was alarmed about what she had learned from PwC.

58.     Plaintiff knew that IntraFi runs a marketplace used by more than 3,000 financial institutions — most of them US banks and US Broker/Dealers— that help consumers, businesses, investors, and other clients protect and insure their deposits in the event of a potential bank run or bank failure. Its entire business model hinges on the fact that the FDIC protects deposits up to $250,000 — but any more than that in a given financial account would be lost if a bank went under. IntraFi collects a fee by helping depositors spread their money around to different institutions, ensuring that they have no more than $250,000 at any one bank. SOX § 404, 15 U.S.C. § 7262 requires management to evaluate the design and implementation of internal controls. Any shortcomings must be disclosed. Further, internal and external auditors need to evaluate whether management's assessments of internal controls are accurate. *Id*.

59.     A company of IntraFi's size and impact would require regularly identifying and documenting potential risks, developing, and implementing risk control procedures, defining clear risk appetite and limits, reporting issues and events, performing self-assessments, testing controls, conducting audits across all auditable entities, risk training, and ensuring strong governance, regulatory compliance and a risk-aware culture.

60.     That same afternoon, at approximately 1:00 pm ET, Plaintiff met with Joanne Talbot, Vice President of Human Resources, to discuss hiring.

61.     Plaintiff suggested that it would be ideal to hire senior-level professionals and leaders for program roll-out of enterprise risk management and internal audit functions not in

place. Plaintiff also recommended that although only two roles were pre-approved as a result of her request, she likely needed more – closer to five additional roles for 2025.

62.     Plaintiff identified the need for a full-time employee focused on Internal Audit and another seasoned role to establish a Regulatory Compliance program, given the company's uptick in due diligence inquiries about IntraFi's Regulatory Compliance program and practices. Plaintiff served as both the Chief Risk Officer and Chief Audit Officer, yet she was a team of one. There were no other full-time employees assigned to Internal Audit or Enterprise Risk Management other than Plaintiff. Simply put, there was no Regulatory Compliance or Enterprise Risk Management program at IntraFi.

63.     In response to Plaintiff's request. Ms. Talbot defensively argued that the requested levels for hires requested were substantially higher than expected. Ms. Talbot stated that she had to have a discussion with Mr. Jacobsen and Ms. Gayle because the company had only planned to hire Junior low-level analysts.

64.     This response was contradictory to what had been conveyed to Plaintiff at the point of her hire and during her interviews. Ms. Gayle had told Plaintiff that the company would look to her to provide the vision for what is needed and that she would have the company's full support in executing her vision and roadmap for the design and buildout of risk management and compliance programs.

### B.  Defendant Failed to Disclose the Details of the Data Breach to its FFIEC Regulators, Including the Financial Industry Regulatory Authority (FINRA), its Clients and Potential Acquirers

*1.  Plaintiff Raised Concerns During a Crisis Management Team Meeting*

12

65.    On March 24, 2025, IntraFi learned from the FBI that the company was a victim of a Chinese cyberattack and that their data was stolen. Mr. Hopper notified Plaintiff that very evening.

66.    The next day, on March 25, 2025, IntraFi huddled for a Crisis Management team meeting to discuss the details of the event and next steps. The meeting was attended by many key C-suite level members, including but not limited to Ms. Gayle, Head of Legal, CFO, Head of Regulatory Affairs, CIO, and CISO. The CEO did not attend this meeting.

67.    It was clear to Plaintiff that IntraFi was concerned about the incident because the team meeting was instructed to be conducted in-person and intentionally coordinated over personal text messages and not on the corporate network. There was concern that the bad actor of the hack could still be on the network as stated by the CIO.

68.    During the meeting, Plaintiff learned that IntraFi was contacted by the FBI and informed that IntraFi had been breached. The CISO explained it was due to a known zero-day vulnerability in their firewalls. The bad actor had successfully infiltrated data, including configuration files, which held sensitive credential information.

69.    She also learned, however, that IntraFi just discovered this breach and it was not yet clear on what type of data had been compromised or if hackers continued to access the network.

70.    What was more alarming was the executives' behaviors at the meeting. Many tried to dismiss the event as a minor incident. One executive called it a "nothing burger."

71.    Plaintiff was seriously concerned about the implications of this type of data breach. Plaintiff engaged in protected activity by first speaking up at the meeting. She explained that even if Personally Identifiable Information (PII) data was not compromised, a confirmed external known nation state actor breach with exfiltration itself was a major event that should be disclosed

13

to governing regulators, and that IntraFi had an obligation to notify regulators, agencies, their settlement agent Bank, likely IntraFi clients (US banks and broker/dealers) of the breach. To underscore the gravity of the situation, Plaintiff cited another data breach she was recently informed about involving IntraFi and Goldman Sachs and how diligent Goldman had been in notifying IntraFi and documenting the event to their regulators.

72.    Plaintiff also made at least two recommendations to address the data breach.

73.    First, Plaintiff raised that the company needed to disclose the data breach to various regulators and consumers, including 3,000 banks and broker/dealers, as well as the Board and other key parties. Plaintiff recalls noting that several C-suite level members seemed incredibly disturbed by the idea.

74.    Second, Plaintiff raised that the company was subject to a 36-hour cyber incident notification rule to notify their regulators (e.g., FRB, FDIC, OCC and potentially others). Plaintiff further explained that a data breach such as this one and the FBI reaching out was serious; that it was important to adhere to the notification rules and review the company's member agreements as well as insurance policy to determine if the company had any obligations to notify. She reiterated that the purpose of the cyber incident reporting rule was to provide notice of an incident as early as possible to minimize impact on the entire financial system. She also recommended reporting of the breach to the Risk Committee of IntraFi's Board of Directors.

75.    The March 25, 2025 meeting was the first time that C-suite level executives had heard Plaintiff vocalize concerns about the data breach and the company's obligation to notify other parties such as regulators (FFIEC agencies, FINRA, individual States/Attorney Generals as required), clients (banks, broker/dealers, and other depository members) and other third-parties such as Bank of NY – IntraFi's settlement and record-keeping agent.

14

76. As the CRO, Plaintiff did not want to be held liable for concealing the foreign actor data breach.

77. About an hour after the Crisis Management team meeting, Plaintiff was informed by Mr. Hopper in her office that he had briefed Mr. Jacobsen about the data hack and meeting. There was pushback from Mr. Jacobsen as to Plaintiff's recommendations to adhere to notification and regulatory obligations.

78. Mr. Hopper instructed Plaintiff, "Mark does not want anyone to talk about this to anyone. He especially said you and Rae-Ann should only watch how we handle this event—just watch and learn. Mark is extremely concerned this incident will get out and be miscommunicated. He does not want any of our banks or even Internal Audit to be made aware."

79. He added that Mr. Jacobsen will be leading the pre-scheduled meeting with the FRB, and that a separate meeting on the data breach would be conducted between Mr. Hopper, the CIO, CISO and the FRB if needed.

80. Plaintiff was again extremely intimidated by these instructions, especially after the discussion she recently had with Ms. Gayle about the company retracting components of her compensation package.

81. Plaintiff reluctantly agreed to stay silent during the meetings but expressed that it was challenging for her to do her job with such restraints.

*2. Plaintiff Met with Federal Reserve Board Regulators*

82. Plaintiff attended three meetings with FRB regulators during her unexpectedly short-lived career at IntraFi.

83.     First, on March 25, 2025 at 11:30 a.m., Plaintiff joined CEO Jacobsen, and the former CRO, in a pre-scheduled meeting with the FRB. Mr. Jacobsen introduced Plaintiff to the Federal Reserve as the new CRO and the main point of contact moving forward.

84.     Further, during the meeting, much to Plaintiff's concern, Mr. Jacobsen failed to disclose the breach in full detail but simply mentioned that the company was looking into an event and claimed that Plaintiff would set up a meeting later with the regulators, Mr. Hopper, and IntraFi's CISO. FRB stated that they appreciated IntraFi's transparency and timely notification.

85.     Second, on March 25, 2025, Plaintiff joined another meeting with Mr. Hopper, the CISO, and FRB examiners. The examiners asked about 20-30 questions and requested another update on the event soon thereafter.

86.     Later that day, one of the FRB examiners directly reached out to Plaintiff separately and asked for a status meeting to discuss the data breach further and mentioned that there was no need to bother others working on the matter. As such, Plaintiff scheduled her solo meeting with the FRB.

87.     On March 27, 2025, Plaintiff met with the FRB for a third time, this time by herself, as requested by the FRB. Plaintiff and the FRB discussed the recent data breach in detail and how the FRB would provide ongoing supervision in the current circumstances. Plaintiff committed to following up on several inquiries made by the FRB as well as provided her thoughts on how this matter should be handled by IntraFi, underscoring the seriousness of a data breach at a company like IntraFi. The CEO, the CLO, the CAO, the CIO, and the CISO all had knowledge of this meeting.

88.　But of course, IntraFi did not like Plaintiff's close contact with the FRB for fear that she could report the truth regarding the data breach and other details regarding risk management and compliance that could risk the company's exposure to regulators.

## IV.　Defendants Had Knowledge of Plaintiff's Concerns about the Company's Violations

### A.　Plaintiff Tried to Rectify Issues Related to the Data Hack

89.　Plaintiff provide direct notice to IntraFi management of her knowledge and concerns about IntraFi's SOX, FFIEC and FINRA violations, as well as FRB, OCC, FDIC, SEC and FINRA violations governing notice.

90.　For example, after the data hack, in addition to raising it during the Crisis Management Team Meeting, Plaintiff followed up with the Head of Legal and inquired as to whether the team had reviewed the member agreements and insurance policies to determine IntraFi's obligations for disclosures to IntraFi's customers. The Head of Legal stated no and seemed to avoid any commitment. He was one of the C-suite members that was visibly uncomfortable and had disapproved of Plaintiff's recommendations.

### B.　Plaintiff Provide Notice to C-Suite Level Members of Her Protected Activity

91.　In addition to warning about IntraFi's obligations to adequately address the significant data breach, during Plaintiff's short tenure with IntraFi, she also engaged in the following protected activities related to the Enterprise Risk Management (ERM) and Internal Audit programs that alarmed IntraFi.

92.　First, Plaintiff inquired about an anonymous complaint hotline for employees to raise risk and compliance concerns. She noted that a company managing $740 billion in assets would be expected to have this type of reporting channel.

17

93.     Additionally, Plaintiff actively reviewed due diligence requests from multiple financial institutions inquiring about IntraFi's risk management, regulatory compliance, and audit practices (and IntraFi's proposed responses). She also reviewed policies and procedures IntraFi asked her to sign off on, and provided feedback on deficiencies and gaps observed in them as well as challenges in evidencing what was documented and being provided. She also provided feedback on improving the company's Enterprise Risk Management, Regulatory Compliance and Internal Audit programs. For example, Plaintiff cited FFIEC references their examiners use to perform examinations on IntraFi for enhancing best practice and compliance.

94.     Further, she also escalated the need to hire additional resources to support the ERM (including Regulatory Compliance) and Internal Audit functions.

## V.      Defendants Terminated Plaintiff for Engaging in Protected Activity

95.     The timing of Plaintiff's termination and its nexus to her engagement in protected activity demonstrates that she was fired for retaliatory reasons.

96.     On March 27, 2025, after her meeting with the FRB examiners, Plaintiff met with Mr. Jacobson. At the meeting, Mr. Jacobson informed Plaintiff that "it wasn't going to work," that "IntraFi is a strange group".

97.     However, this was false. IntraFi sought to terminate Plaintiff for engaging in protected activity. Notably, the following statements indicate that Mr. Jacobsen had knowledge of Plaintiff's protected activity:

•       "I told you, just watch and do nothing for 6 months. Do nothing";

•       "The company isn't ready for more risk management."

•       "People sometimes ask questions or think they can tell us what to do when they don't know us or our business"; and

• "Someone asking a question may not be well received and we are just weird here."

98.    Prior to Plaintiff voicing her concerns, CEO Jacobsen had raved just days earlier that "she was perfect for the role." There are emails documenting positive feedback from trainers regarding Plaintiff just a few days prior to her termination.

99.    There was clear opposition to Plaintiff's initiative to rectify the data hack and bolster the company's risk management, regulatory compliance, and auditing functions.

100.    Plaintiff sensed that the company wanted the upcoming deal to go through and that the company did not want to do anything that would serve as an impediment. Most of the C-suite executives stood to greatly benefit financially in the event of a sale. Indeed, Mr. Jacobson remarked during their last meeting that Plaintiff was exceptional and that she did not do anything wrong.

101.    Plaintiff also met with Ms. Gayle. Their conversation demonstrated that Plaintiff was also subjected to retaliation for raising questions and concerns about the proposed modification to her signed compensation agreement. For example, when Plaintiff inquired as to whether her termination was tied to the conversation regarding her compensation package or data breach recommendations, Ms. Gayle said, "Not really. But I have been wondering if you are upset and that you will not trust us." Ms. Gayle also told Plaintiff that people at IntraFi were concerned that she wanted to add too much risk management at the Company.

102.    During the meeting, Ms. Gayle asked why Plaintiff was still looking into the bank contracts and requesting that the Company notify the banks. Plaintiff explained that the company needed to review, understand and appreciate all notice obligations of the data breach.

103.    Ms. Gayle had also attended the Crisis Management meeting where Plaintiff had made these recommendations, so Ms. Gayle was also aware of Plaintiff's protected activity. IntraFi wanted to silence Plaintiff's efforts early on.

19

104. On March 27, 2025, IntraFi officially informed Plaintiff of her termination effective March 31, 2025, for warning the company of potential legal implications of failing to adequately address the data breach and suggesting changes to the company's risk management, regulatory compliance, internal controls, and audit function.

105. Reactions to Plaintiff's conduct demonstrate that the company did not approve of Plaintiff's risk-related guidance.

106. Further, IntraFi did not approve of Plaintiff wanting to speak about the data hack incident and the consequences of forgoing the proper compliance protocols. By quickly terminating a CRO like Plaintiff, IntraFi and Nexus wanted to remove any potential roadblock to the pending sale of the company—an act of deception that would prove to be detrimental to the company's risk management operations.

## CAUSES OF ACTION

### COUNT I – RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C SECTION 1514 A

107. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

108. Plaintiff engaged in protected activity under SOX, 18 U.S.C. § 1514A, when she raised concerns regarding Defendants' failure to maintain adequate internal controls, risk management, regulatory compliance, and disclosure practices, including concerns about: 1) the company's data breach; 2) the company's near-total absence of enterprise-wide risk management, regulatory compliance, and internal audit functions, as confirmed during her meeting with PwC; and 3) the company's lack of whistleblower reporting channels and significant deficiencies in compliance, governance, and audit.

20

109. Plaintiff's protected disclosures were known to senior leadership, including the CEO, CAO, CIO, CISO, CFO and Head of Legal.

110. After Plaintiff raised these concerns, Defendants expressed hostility toward her protected activity, including instructing her to "stay silent," "watch and learn," and refrain from discussing the data breach with regulators, clients, or internal audit.

111. On March 27, 2025, just two days after Plaintiff spoke with the Federal Reserve Board examiners about the breach, Defendants terminated Plaintiff's employment. Defendants criticized her for asking questions, demonstrating retaliatory motive based on her protected reports.

112. Defendants' termination of Plaintiff for engaging in protected activity violates 18 U.S.C. § 1514A, which prohibits employers of covered entities from retaliating against employees for reporting conduct reasonably believed to constitute violation federal securities law, SEC rules, and, fraud-related statutes.

113. Defendants' stated reasons for termination were pretextual. Prior to Plaintiff's protected activity, Plaintiff had received only positive feedback and was repeatedly praised as an ideal fit for the CRO role.

114. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered lost wages, bonuses and equity, damage to reputation, emotional distress, and other compensatory damages.

115. Plaintiff is entitled to all available relief under 18 U.S.C. § 1514A.

### <u>COUNT II – RETALIATION IN VIOLATION OF THE VIRGINIA WHISTLEBLOWER PROTECTION LAW, VA CODE SECTION 40.1-27.3</u>

116. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117.   The Virgina Whistleblower Protection Act ("VWPA"), Va. Code § 40.1-27.3, prohibits employers from discharging, disciplining, threatening, or otherwise retaliating against an employee because the employee (a) in good faith reports a violation of any federal or state law or regulation to a supervisor or governmental body, (b) refuses to engage in a criminal act or an act that the employee reasonably believes violates a federal or state law or regulation, or (c) participates in an investigation or inquiry conducted by a governmental body.

118.   Plaintiff engaged in protected activity under VWPA, Va. Code § 40.1-27.3, when she raised concerns regarding Defendants' failure to maintain adequate internal controls, risk management, regulatory compliance, and disclosure practices, including concerns about: 1) the company's data breach; 2) the company's near-total absence of enterprise-wide risk management, regulatory compliance and internal audit functions, as confirmed during her meeting with PwC; and 3) the company's lack of whistleblower reporting channels and significant deficiencies in compliance, governance, and audit.

119.   Plaintiff's protected disclosures were known to senior leadership, including the CEO, CAO, CIO, CISO, CFO, Head of Regulatory Affairs, and Head of Legal.

120.   After Plaintiff raised these concerns, Defendants expressed hostility toward her protected activity, including instructing her to "stay silent," "watch and learn," and refrain from discussing the data breach with regulators, clients, or internal audit.

121.   On March 27, 2025, just two days after Plaintiff spoke with the Federal Reserve Board examiners about the breach and the last day when she met solo with the FRB, Defendants terminated Plaintiff's employment. Defendants criticized her for asking questions, demonstrating retaliatory motive based on her protected reports.

122.    Defendants' termination of Plaintiff for engaging in protected activity violates the Va. Code § 40.1-27.3, prohibits employers from discharging, disciplining, threatening, or otherwise retaliating against an employee because the employee reported conduct reasonably believed to constitute violation of applicate state statutes.

123.    Defendants' stated reasons for termination were pretextual. Prior to Plaintiff's protected activity, Plaintiff had received only positive feedback and was repeatedly praised as an ideal fit for the CRO role.

124.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered lost wages, bonuses and equity, damage to reputation, emotional distress, and other compensatory damages.

125.    Plaintiff is entitled to all available relief under Va. Code § 40.1-27.3.

### COUNT III – BREACH OF CONTRACT

126.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

127.    Plaintiff and Defendant IntraFi and Nexus entered into a valid and enforceable employment agreement, executed on December 19, 2024, under which IntraFi agreed to provide Plaintiff with a compensation package that included, among other terms, a $400,000 base salary, a $450,000 annual bonus, and an award of Class B Pool shares under the Management Incentive Plan ("MIP") consisting of 271,090,317 Class B units.

128.    Prior to the execution of the agreement, Defendants CEO Jacobsen and CAO Susan Gayle explicitly represented to Plaintiff that the MIP equity award was already approved. Plaintiff reasonably relied on their assurances in deciding to leave her prior employer and accept employment with IntraFi.

23

129.    Approximately two weeks into Plaintiff's employment, on March 20, 2025, Defendant IntraFi and Nexus materially breached the employment agreement by unilaterally retracting the Class B equity award and refusing to honor the terms that had been promised to Plaintiff prior to and at the time of hire.

130.    During this meeting, Ms. Gayle informed Plaintiff that the promised equity compensation would not be honored because private-equity firms involved in IntraFi's pending acquisition did not approve of the offer, despite Ms. Gayle's prior assurances and representation that the Board had approved the compensation structure.

131.    Rather than fulfilling its contractual obligations, Defendants CEO Jacobsen and CAO Susan Gayle attempted to renegotiate Plaintiff's compensation package downward. IntraFi first offered a $450,000 retention agreement over three years and later modified the offer to a $600,000 retention agreement and reduced severance.

132.    IntraFi's breach caused Plaintiff significant financial, professional, and reputational harm. Plaintiff reasonably relied on the promised compensation terms in deciding to leave her prior position.

133.    As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered damages including, but not limited to, lost equity compensation, lost bonuses and other incentives, loss of expected earnings, and consequential damages stemming from Defendants' misrepresentations and failure to honor the agreement.

**COUNT IV – NEGLIGENT AND INTENTIONAL MISREPRESENTATION**

134.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

135. Plaintiff and Defendants IntraFi and IntraFi entered into a valid and enforceable employment agreement, executed on December 19, 2024, under which IntraFi agreed to provide Plaintiff with a compensation package that included, among other terms, a $400,000 base salary, a $450,000 annual bonus, and an award of Class B Pool shares under the Management Incentive Plan ("MIP") consisting of 271,090,317 Class B units.

136. Prior to the execution of the agreement, Defendants CEO Jacobsen and CAO Susan Gayle explicitly represented to Plaintiff that the MIP equity award was already approved. Plaintiff reasonably relied on assurances in deciding to leave her prior employer and accept employment with IntraFi.

137. At the time the representations were made, Defendants CEO Jacobsen and CAO Gayle either knew the statements were false or, at minimum, failed to exercise reasonable care in ensuring their accuracy, given that private equity firms involved in IntraFi's anticipated acquisition had not approved and later objected to the equity awards offered to new executives, including Plaintiff.

138. Plaintiff reasonably relied on these statements in evaluating and accepting the offer of employment.

139. Approximately two weeks into Plaintiff's employment, on March 20, 2025, Defendants CEO Jacobsen and CAO Gayle materially breached the employment agreement by unilaterally retracting the Class B equity award and refusing to honor the terms that had been promised to Plaintiff prior to and at the time of hire.

140. Misrepresentations were made in the course of its business and for the purpose of inducing Plaintiff to accept employment, and Defendants failed to exercise the reasonable care required when providing information about material terms of employment.

141. As a direct and proximate result of Defendants' negligent and intentional misrepresentations, Plaintiff has suffered damages including, but not limited to, lost equity compensation, lost bonuses and other incentives, loss of expected earnings, and consequential damages stemming from Defendants' misrepresentations and failure to honor the agreement.

## COUNT V - FRAUDULENT INDUCEMENT

142. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

143. Plaintiff and Defendants IntraFi and Nexus entered into a valid and enforceable employment agreement, executed on December 19, 2024, under which IntraFi agreed to provide Plaintiff with a compensation package that included, among other terms, a $400,000 base salary, a $450,000 annual bonus, and an award of Class B Pool shares under the Management Incentive Plan ("MIP") consisting of 271,090,317 Class B units.

144. Prior to the execution of the agreement, Defendants CEO Jacobsen and CAO Susan Gayle explicitly represented to Plaintiff that the MIP equity award was already approved. Plaintiff reasonably relied on assurances in deciding to leave her prior employer and accept employment with IntraFi.

145. At the time these representations were made, Defendants CEO Jacobsen and CAO Gayle knew, or recklessly disregarded the fact, that they were false. Private equity firms involved in IntraFi's anticipated acquisition had not approved the equity awards offered to new executives and later objected to those awards, including Plaintiff.

146. Defendants CEO Jacobsen and CAO Gayle made these assurances knowingly, with the intent to induce Plaintiff to rely upon them and to accept the CRO position.

147.   Plaintiff reasonably relied on these statements in evaluating and accepting the offer of employment.

148.   Approximately two weeks into Plaintiff's employment, on March 20, 2025, Defendants materially breached the employment agreement by unilaterally retracting the Class B equity award and refusing to honor the terms that had been promised to Plaintiff prior to and at the time of hire.

149.   Defendants CEO Jacobsen and CAO Susan Gayle misrepresentations were intentional and were made for the purpose of inducing Plaintiff to rely upon them and accept employment with IntraFi under false pretenses.

150.   As a direct and proximate result of Defendants' fraudulent inducement, Plaintiff has suffered damages including, but not limited to, lost equity compensation, lost bonuses and other incentives, loss of expected earnings, and consequential damages stemming from Defendants' misrepresentations and failure to honor the agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants IntraFi and Nexus as to Counts I-III, and all Defendants IntraFi, Nexus, CEO Jacobsen, and CAO Gayle as to Counts IV-V, and for the Court to award:

(a) Plaintiff, all allowable damages, interest, fees and costs resulting from Defendants' retaliation, including her lost pay and benefits, and other compensatory damages;

(b) Plaintiff, her litigation costs, expenses, and reasonable attorney's fees; and

(c) Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 31, 2026

Respectfully submitted:

/s/ Grant Morris
Grant Morris (Virginia Bar #16290)
**SANFORD HEISLER
SHARP MCKNIGHT, LLP**
700 Pennsylvania Avenue SE, Suite 300 Washington, DC 20003
Telephone: (202) 486-0678
Facsimile: (646) 402-5651
Email: gmorris@sanfordheisler.com

Kevin H. Sharp (Tennessee Bar #16287)*
**SANFORD HEISLER
SHARP MCKNIGHT, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7001
Facsimile: (615) 434-7020
Email: ksharp@sanfordheisler.com
*Pro hac vice forthcoming

Sarah Chu*
**SANFORD HEISLER
SHARP MCKNIGHT, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202)-499-5200
Facsimile: (646) 402-5651
Email: schu@sanfordheisler.com
*Pro hac vice forthcoming

Attorneys for Plaintiff